**M. N. BERRY COMPANY, Inc., Appellant,**

v.

**Leslie C. GAY et ux., Appellees.**

Court of Appeals of Kentucky.

Nov. 8, 1968.

**44**

Bruce H. Phillips, Monticello, for appellant.

J. Milton Luker, Luker, Luker & Roberts, London, for appellees.

EDWARD P. HILL, Judge.

The appeal is from a judgment dismissing appellant's complaint in which it sought to recover $3,579.04 from appellees for plumbing and other fixtures installed in appellees' new house. The work was not done by contract with appellees but under an independant contractor, Hayes Perkins.

The complaint, filed January 15, 1964, alleged a contract with Perkins "ratified" by appellees; that the material and labor were furnished between March 14, 1963, and September 25, 1963; that it notified appellees December 9, 1963, of its intention to assert a lien on the property; that it filed notice of lien December 28, 1963; that Perkins was a "general contractor and agent" for appellees; that appellees "exercised such control over distribution of funds and had such knowledge and control and made such promises and commitments to this plaintiff" that an "implied or express" contract resulted requiring appellees to pay its debt.

Appellees' answer contained a general denial of the allegations of the complaint and alleged affirmatively that appellant did not perfect a lien on their property as required by KRS 376.010(3), and if it did so, it waived its lien so that appellees could mortgage their property and pay other creditors of appellees.

By its first amended complaint, appellant alleged appellees promised and agreed to pay its debt in consideration of appellant's waiver of its right to "file a lien" on appellees' property, or by its agreement not to "participate in the distribution of construction funds."

Appellant alleged in its second amended complaint that appellees "had by a valid agreement, settled the action for the sum of $2,579.04."

At the conclusion of plaintiff's evidence on motion of the defendants, the court directed a verdict for defendants, appellees herein. This appeal followed.

Appellant admits in its brief that its "efforts to file a lien came too late," but says that appellees' conduct thwarted its efforts.

The facts must be reviewed in determining the propriety of the ruling of the trial court.

The trial court's action in sustaining defendants' motion for a directed verdict at the close of plaintiff's case leaves us with only plaintiff's evidence, which we must consider as uncontradicted.

Diverting our attention momentarily from the facts, it is recalled appellant plead-

ed a promise by appellee Gay that if appellant would forego participation in the proceeds of a loan Gay was negotiating, he, Gay, would pay the debt to appellant. The trial court concluded that even if such a promise was made it was without consideration when the court announced to the jury preliminary to directing it to find for appellees: "[T]he basis of it is they claim that Mr. Gay over there made a promise to do so and so, any promise you make with no consideration is void * * * any promise that Mr. Gay made about that wouldn't be valid or bind him because he wasn't getting a dime out of it, it didn't hurt him which way it went and so I am giving the jury peremptory instruction to find for Mr. Gay over there * * *."

The question whether this alleged promise was based upon a valid consideration. must depend upon when it was made and other circumstances of the parties at the time it was alleged to have been made. Although appellant's witness did not state the year in which he stated the promise was made, he did say it was "along about the 18th or 20th of September * * * as the house was being completed, about completed." So we assume September 1963 was the month in which appellant furnished the last item of labor or material under its contract with Perkins, long before the end of the seventy-five-day period in which he had to file his lien under KRS 376.010 (3). We quote some of the evidence on this question given by the witness Berry:

"Q.26 After you completed your work, did you have any conversation with Mr. Gay relative to his payment of this balance of $3,579.04?

"A. Well, as the house was being completed, about completed, as I recall, and I understand that quite a few of the other fellows, the other contractors, the other suppliers and laborers on the job were through, we were all about through one morning I had been to the bank and I came in and they said Mr. Gay was looking for me up in his office, and I asked them what

he wanted, they didn't know, said he wanted to see me, so I went up there it was along about the 18th or 20th of September, and when I got up there the girl took me into Mr. Gay's office and closed the door and Mr. Perkins was sitting there and we spoke and Mr. Gay said, Berry, we've got a situation here we are going to have to do something about and we've got this kind of a proposal to offer to you he said I have some people that's pressing me pretty hard for some of my accounts and threatening to sue me and threatening to file liens, and you've always been very nice about it and what we'd like to do is pay these other follows off and let Mr. Perkins make a mortgage on his house down in Monticello, said that Mutual Federal would let him have the money and let him pay you with that money that he gets from his house, and I objected to it, and I said, Mr. Gay that's not hardly right if you're going to do that looks to me like you'd let everybody wait and pay them all at the same time, I said that's the only way I'd see that would be fair, he said now, Berry, you don't need to worry, I'll, if Perkins, anything happens to this deal I'll take care of it, I'll pay it for him, he said, I'll see that you get your money, and I said, and of course he said that in the presence of Mr. Perkins and I said, well, Les if you'll do that—we'd always had good relations, I'd know (sic) Les a long time and we'd done a lot of things together and I had no reason to doubt his word.

"Q.27 Now do you know why he was wanting you to forgo (sic) the collection of your claim at that time?

"A. Well I hadn't—I hadn't been insisting on my money and I understand that he had people that were, in fact, he told me that and Mr. Perkins also that there were some people getting pretty rough about their money, wanting their money pretty bad, and that it was necessary for him to get these payments out, and he had enough money in the building and loan, he said, to pay these people but he didn't have enough to pay me also and that he was going to issue checks and pay these

people, these other contractors, and other suppliers and if I would wait a few days he would take care of me."

\* \* \* \* \* \*

"Q.34 Now did you later have any conversation with Mr. Gay concerning his agreement to pay this account?

"A. I went to see him and, oh, a couple of weeks after that and I said to Les, I said, I don't believe that Mr. Perkins is going to get that loan, and I think that you're going to have to do something about it and he said, well, I'm busy right now and he said, I've got some tobacco to get in and he said I'll go down and see Mr. Perkins and see if I can't get that straightened out and we'll get something done on it right away, well, there was nothing done and I went to see him about—oh, I talked to him two or three times, I think, I went to his office and discussed it with him, and Mr. Gay didn't have must to say, at that time, or any of those times, he was pretty quiet about things, but then when it got apparently to the place where if I were going to file a lien, it would be necessary for me to do that I went and told Les that I was going to file a lien and that if he didn't do something about it, I would have to file a lien.

"Q.35 Now did he ever make any other statement in your presence, to you or to anybody else, concerning his agreement to pay you your claim in full?

"A. One day, oh, just about the time all this settling business was happening—just a little prior to that I'd say—Mr. Yeary and I—we were going in—we were all going in to the Kiwanis Club at the Beecher Hotel and he sort of got on Mr. Yeary about him writing him a letter that he was going to file a lien, an intent, and he said —then he said—said now, here you are you treat me like this and he said, said Berry's a gentleman—said he hasn't said a word about it, he's just letting it go and he said,

I don't appreciate the way you done by sending me this letter.

"Q.36 Did he make any further statements about what he intended to do about your claim?

"A. He said, well, he said at that time, said Berry has been a gentleman about it and I'm going to pay him—he don't have to worry about that, I'll pay him, take care of his lien—his bill, but that was, I hadn't even asked him about money, at that time."

■ If the above evidence is true, and we must assume it is true under the present record, appellant could very well have relied upon Gay's promise and postponed the perfection of a lien. Furthermore such promise was in all probability a benefit to Gay in securing a smaller loan with which to satisfy other claimants. Such a contract is enforceable notwithstanding the Statute of Frauds. The Statute of Frauds was not pleaded by appellees. Cf. State Automobile Insurance Company v. Wilson, Ky., 280 S.W.2d 537.

■ We conclude the trial court was in error in its determination that the alleged promise was without consideration and in directing a verdict for Gay at the conclusion of appellant's evidence.

■ In its summation to the jury, the trial court failed to mention appellant's second argument in which it contended the parties entered into a binding agreement to settle appellant's claim for $1,000 less than the amount it claimed. If upon another trial the evidence justifies it, an appropriate instruction should be given on this issue. The law favors compromise settlements. Lincoln-Income Life Insurance Co. v. Kraus, 279 Ky. 842, 132 S.W.2d 318.

The judgment is reversed with direction to grant appellant a new trial.

All concur.